## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| COSMETIC LASER, INC., individually and on behalf of all others similarly situated,<br>　　　　Plaintiff,<br><br>　　　v.<br><br>TWIN CITY FIRE INSURANCE COMPANY,<br>　　　　Defendant. | No. 3:20-cv-00638 (SRU) |

## <u>RULING ON MOTION TO DISMISS</u>

Cosmetic Laser, Inc. ("Cosmetic Laser") owns multiple spas in Ohio that were shut down during the COVID-19 pandemic.  Individually, and on behalf of other class members, Cosmetic Laser sued its property insurer, Twin City Fire Insurance Company ("Twin City"), for breach of contract.  Cosmetic Laser asserts various theories for why its losses are covered.  Because those theories are not convincing, I **grant** Twin City's motion to dismiss.

## I.　　　Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).  When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (cleaned up).  Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely."  *Id.* at 556 (cleaned up).

## II.    Background

### A.    Factual Background

#### 1.    The Parties and The Policy

The plaintiff, Cosmetic Laser, is a Medi Spa[1] with locations in Mentor and Chardon, Lake County, Ohio.  *See* Am. Compl., Doc. No. 34, at ¶ 1.  Cosmetic Laser offers "personalized skincare treatments, Botox treatments, wellness massages, laser hair removal, and many other services, including private spa parties for groups of 4-6 people."  *Id.*

Cosmetic Laser purchased insurance, including property coverage, from Twin City.  *See id.* at ¶ 8.  I will refer to that insurance contract as "the Policy."  *See* Policy, Ex. A to Mot. for J.

---

[1]    Although Cosmetic Laser does not elaborate, a "Medi Spa" appears to be a "medical spa," which is a "kind of [] hybrid between the traditional day spa and a medical clinic."  Angela Palmer, *When to Choose a Medical Spa*, VERYWELLHEALTH (Nov. 23, 2019), https://www.verywellhealth.com/what-is-a-medical-spa-15896.

on the Pleadings, Doc. No. 31-3.[2]  The Policy covered the period from February 8, 2020 to February 8, 2021.  *See* Am. Compl., Doc. No. 34, at ¶ 23; Policy, Doc. No. 31-3, at 15.  The Policy provided for property coverage in a "Special Property Coverage Form."  *See* Policy, Doc. No. 31-3, at 34–58.

The Policy was an "all risk" policy, meaning that it "cover[ed] all risks of loss except for risks that are expressly and specifically excluded."  Am. Compl., Doc. No. 34, at ¶ 24.  Put differently, according to the Policy, Twin City agreed to "pay for direct physical loss of or physical damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss."  Policy, Doc. No. 31-3, at 34.  The Policy also defined "Covered Causes of Loss" as, in relevant part, all "risks of direct physical loss" except those "[e]xcluded in Section B., EXCLUSIONS."  *Id.* at 35.  The parties dispute whether several sections in the Policy cover Cosmetic Laser's claim.  Those sections are:  (1) the Virus Endorsement,[3] (2) the Business Income provision, (3) the Extra Expense provision, and (4) the Civil Authority provision.

The contractual provisions that the parties most heatedly contest are contained in the Virus Endorsement.  In relevant part, the Virus Endorsement adds the following exclusion to Section B of the Policy:

### i.  "Fungi", Wet Rot, Dry Rot, Bacteria And Virus

We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

> (1) Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.

---

[2]  The Policy was attached to Twin City's motion for judgment on the pleadings, which I denied as moot after Cosmetic Laser filed an amended complaint and Twin City filed a subsequent motion to dismiss that amended complaint.  Even though this is a motion to dismiss, I may consider the Policy because it is integral to the complaint and is referenced throughout the complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

[3]  Although the Policy refers to that section as a "Limited Fungi, Bacteria or Virus Coverage" endorsement, for simplicity, I refer to it as the "Virus Endorsement."  *See* Policy, Doc. No. 31-3, at 130–132.

> (2) But if "fungi", wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, we will pay for the loss or damage caused by that "specified cause of loss."

Policy, Doc. No. 31-3, at 130.  I will refer to that exclusionary provision of the Virus Endorsement as the "Virus Exclusion."  "Specified cause of loss" is defined as: "[f]ire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." *Id.* at 58.  The Virus Endorsement limits the scope of the Virus Exclusion.  The Virus Endorsement continues:

> This exclusion does not apply:
>
>> (1)  When "fungi", wet or dry rot, bacteria or virus results from fire or lightning; or
>>
>> (2) To the extent that coverage is provided in the Additional Coverage – Limited Coverage for "Fungi", Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning.
>
> This exclusion applies whether or not the loss event results in widespread damage or affects a substantial area.

*Id.* at 130.  In Section B.1, the Virus Endorsement clarifies the Policy's "[l]imited coverage for 'fungi', wet rot, dry rot, bacteria and virus." *Id.* at 131.  Section B.1 reads as follows:

> **1.  Limited Coverage For "Fungi", Wet Rot, Dry Rot, Bacteria and Virus**
>
>> a.  The coverage described in **1.b** below only applies when the "fungi", wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.
>>
>>> (1) A "specified cause of loss" other than fire or lightning;
>>>
>>> (2) Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises.

    b.  We will pay for loss or damage by "fungi", wet rot, dry rot, bacteria and virus.  As used in this Limited Coverage, the term loss or damage means:

        (1)  Direct physical loss or direct physical damage to Covered Property caused by "fungi", wet rot, dry rot, bacteria or virus, including the cost of removal of the "fungi", wet rot, dry rot, bacteria or virus;

        (2)  The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot, dry rot, bacteria or virus; and

        (3)  The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot, dry rot, bacteria or virus are present.

*Id.*  I will refer to that limited grant of coverage as "Subsection B.1.b."  Coverage under Subsection B.1.b requires that the fungi, wet rot, dry rot, bacteria or virus results from the particular causes provided in Subsection B.1.a.

    Subsection B.1.f—the final subsection of the "Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus" section—concerns the availability of limited Time Element Coverage, which is "a term of art in the insurance industry referring to coverages measured in time, including," as relevant here, Business Income, Extra Expense, and Civil Authority coverage.  *See Q Clothier New Orleans LLC v. Twin City Fire Ins. Co.*, 2021 WL 1600247, at *9 (E.D. La. Apr. 23, 2021) (cleaned up).  The parties disagree regarding whether Subsection B.1.f covers Cosmetic Laser's loss here.  Subsection B.1.f reads as follows:

    f.  The following applies only if a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage.

        (1)  If the loss which resulted in "fungi", wet or dry rot, bacteria or virus does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by

5

"fungi", wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations.  The days need not be consecutive.  If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet or dry rot, bacteria or virus, but remediation of "fungi", wet or dry rot, bacteria or virus prolongs the "period of restoration", we will pay for loss and expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days unless another number of days is indicated in the Declarations.  The days need not be consecutive.

*Id.* at 131–32.

If no exclusion bars coverage for particular losses, the policy provides Business Income, Extra Expense, and Civil Authority coverage.  The phrase "direct physical loss" is relevant to all three provisions.  Because the availability of coverage depends on the definition of "direct physical loss," the parties' dispute over the phrase's meaning is important in this case.  The Business Income provision states:

> o.  Business Income
>
> > (1) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration".  The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.
>
> . . .
>
> > (4) Business Income means the:
> >
> > > (a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and
> > >
> > > (b) Continuing normal operating expenses incurred, including payroll.

6

*Id.* at 43.  "Direct physical loss" also appears in the Extra Expense provision, which reads:

    p.  Extra Expense

        (1) We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.

        . . .

        (3) Extra Expense means expense incurred:

            (a) To avoid or minimize the suspension of business and to continue "operations":

                (i) At the "scheduled premises". . . .

*Id.*  Finally, the Civil Authority coverage provision states:

    q.  Civil Authority

        (1) This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".

        (2) The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of:

            (a) When access is permitted to your "scheduled premises"; or

            (b) 30 consecutive days after the order of the civil authority.

*Id.* at 44.

    2.     The Pandemic

As we all know too well, as part of the effort to curb the spread of COVID-19, businesses across the country have at times been forced to reduce (or cease) their business operations.  The same is true for Cosmetic Laser.

### a.     The Closure Orders

In late March 2020, the State of Ohio issued numerous orders which resulted in the closure of nonessential businesses.  *See* Am. Compl., Doc. No. 34, at ¶¶ 57–59.  The orders were issued in response to the spread of COVID-19.  *See id.* at ¶ 61.  "Although some restrictions have since been relaxed, the Closure Orders caused a necessary total suspension and a necessary partial suspension of Cosmetic Laser's business operations."  *Id.* at ¶ 60.

### b.     COVID-19's Effect on Property Generally

Cosmetic Laser explains that COVID-19 can be transmitted "via human-to-human contact, airborne viral particles in ambient air, and touching surfaces or objects."  *Id.* at ¶ 37.  Cosmetic Laser alleges that, when respiratory droplets containing the virus land on surfaces, they "can remain present and dangerous for periods ranging from hours to many days."  *Id.* at ¶ 39.  Cosmetic Laser claims that droplets "structurally change the property and its surface by becoming a part of that surface."  *Id.* at ¶ 47.  Again, according to Cosmetic Laser, that "structural alteration makes physical contact with those previously safe, inert surfaces (*e.g.*, walls, handrails, furniture) unsafe."  *Id.*  Thus, Cosmetic Laser asserts that "COVID-19 causes physical loss and damage by, among other things, destroying, distorting, corrupting, attaching to, and physically altering property, including its surfaces, and by rendering property unusable, uninhabitable, unfit for intended function, dangerous and unsafe."  *Id.* at ¶ 46.  Cosmetic Laser also claims that virus particles that remain in the air can act "like dangerous fumes" and "make the premises unsafe and affirmatively dangerous."  *Id.* at ¶ 48.  Cosmetic Laser points out that

"many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders." *Id.* at ¶ 35.

Cosmetic Laser claims that COVID-19 additionally causes physical loss and damage "by necessitating remedial measures that include without limitation extensive cleaning and disinfecting, repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, and other measures to reduce or eliminate the presence of" COVID-19. *Id.* at ¶ 52.

*c.*      *COVID-19's Effect on Cosmetic Laser's Property*

Cosmetic Laser alleges that "[t]he presence of COVID-19 caused 'direct physical loss of or physical damage to' covered property under" the Policy "by: (i) causing direct physical loss of or damage to the covered property; (ii) denying use of and damaging the covered property; (iii) requiring physical repair and/or alterations to the covered property; and/or (iv) by causing a necessary suspension of operations during a period of restoration." *Id.* at ¶ 77.

Regarding (i), Cosmetic Laser alleges that the virus caused direct physical damage to its properties because COVID-19, "a physical substance, has attached and adhered to [Cosmetic Laser's] property, and by doing so, altered that property." *Id.* at ¶ 71. "Persons who tested positive for COVID-19 were present" at Cosmetic Laser's property, and virus "droplets have been conveyed from infected persons . . . to solid surfaces . . . and ambient air at the premises." *Id.* at ¶¶ 72, 74. Thus, according to Cosmetic Laser, "COVID-19 structurally altered the surfaces of covered property and ambient air within covered property." *Id.* at ¶¶ 5, 29. Regarding (ii), Cosmetic Laser claims that "[t]he impairment of the business function is also damage to the spas" because Cosmetic Laser "can now, at most, serve only a limited number of customers at a time." *Id.* at ¶¶ 3, 7. And "[u]ntil COVID-19 was brought even slightly under control, even such limited use as this was not possible." *Id.* at ¶ 3. With respect to (iii), Cosmetic Laser states that

9

its safety precautions—including "installing COVID-19 protocol signage; affixing hand sanitizer stations to the walls[;] and stringently cleaning headrests, which destroyed the headrests"— amount to "repair [of] the physical loss or damage." *Id.* at ¶ 80.  Finally, with respect to (iv), Cosmetic Laser states that "the Closure Orders caused a necessary total suspension and a necessary partial suspension of [its] business operations." *Id.* at ¶ 60.

Cosmetic Laser submitted a claim to Twin City "due to the presence of COVID-19 and the Closure Orders, but Twin City denied that claim." *Id.* at ¶ 84.  Cosmetic Laser asserts that "Twin City wrongfully denied [its] claim under the policy." *Id.* at ¶ 18.

B.      Procedural Background

In May 2020, Cosmetic Laser filed its initial complaint against Twin City.  *See* Compl., Doc. No. 1.  In July, Cosmetic Laser made a consent motion to stay while the Judicial Panel on Multidistrict Litigation considered a motion to transfer.  *See* Mot. to Stay, Doc. No. 13.  I granted that motion.  *See* Order, Doc. No. 15.  After the Judicial Panel on Multidistrict Litigation denied centralization, the plaintiffs in this case and several other similar cases pending in the District of Connecticut asked me in December 2020 to consolidate the cases before one judge.  *See* Letter, Doc. No. 28-1.  In January 2021, I exercised my discretion not to reassign all the related cases to one judge.  *See* Notice and Order, Doc. No. 28.

In March 2021, the parties filed their Rule 26(f) report.  *See* 26(f) Report, Doc. No. 29. On April 1, Twin City filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  *See* Mot. for J. on the Pleadings, Doc. No. 31.  A few days later, I held a Rule 16 pretrial conference.  *See* Min. Entry, Doc. No. 32.  There, the parties agreed that the most expeditious path forward was for Cosmetic Laser to file an amended complaint and then for Twin City to move to dismiss that complaint pursuant to Federal Rule of Civil Procedure

12(b)(6).  *See* Conf. Mem. and Order, Doc. No. 33.  On April 9, Cosmetic Laser filed that

amended complaint.  *See* Am. Compl., Doc. No. 34.  Cosmetic Laser seeks to represent a class of

similarly situated persons and entities.  *See id.* at ¶ 85.  On April 23, Twin City filed its motion to

dismiss.  *See* Mot. to Dismiss, Doc. No. 36.[4]  Cosmetic Laser filed an opposition.  *See* Cosmetic

Laser's Opp'n, Doc. No. 37.  And Twin City filed a reply.  *See* Twin City's Reply, Doc. No. 44.[5]

In June, Cosmetic Laser filed a notice of supplemental authority.  *See* Notice, Doc. No. 45.  In

July, Twin City also filed a notice of supplemental authority.  *See* Notice, Doc. No. 53.  In early

August, Twin City filed another notice of supplemental authority.  *See* Notice, Doc. No. 57.  On

August 5, I held a hearing on Twin City's motion to dismiss and took the motion under

advisement.  *See* Min. Entry, Doc. No. 58.

## III.    Discussion

### A.    Relevant Law

Although the parties apparently agree that this case presents no choice-of-law issue,[6] as a

formal matter, the parties appear to disagree regarding whether Ohio law or Connecticut law

applies in this case.  Twin City posits that Ohio law applies because the Policy was issued in

Ohio and "no other state has a more significant relationship to the transaction and the parties."

Mem. of Law in Supp. Twin City's Mot. to Dismiss ("Twin City's Mem. of Law"), Doc. No. 36-

1, at 14.  By contrast, Cosmetic Laser states that Connecticut law applies because "it is the law of

the forum and neither party has identified an actual conflict of laws between Ohio and

Connecticut."  Cosmetic Laser's Opp'n, Doc. No. 37, at 13.

---

[4]     As described above, *see supra* n.2, after Twin City filed its motion to dismiss, I denied as moot without prejudice Twin City's previous motion for judgment on the pleadings.  *See* Order, Doc. No. 38.
[5]     Twin City filed two replies on the same day.  *See* Replies, Doc. Nos. 43 and 44.  The two replies appear virtually identical, but Twin City filed the second reply (doc. no. 44) as a "corrected version" of its first reply, so I rely on the second reply.
[6]     At the hearing on Twin City's motion to dismiss, both parties confirmed as much.

"A federal court sitting in diversity . . . must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). Where, as here, a contract contains no exclusive choice-of-law provision, Connecticut applies "the 'most significant relationship' approach of the Restatement (Second) of Conflict of Laws[] for analyzing choice of law issues involving contracts." *Interface Flooring Sys., Inc. v. Aetna Cas. and Sur. Co.*, 261 Conn. 601, 608 (2002). Section 188 of the Restatement (Second) of the Conflict of Laws "provides in relevant part:  . . . The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties . . . ." *Id.* at 608–09 (quoting Restatement (Second) of Conflict of Laws § 188) (cleaned up).

As the parties implicitly acknowledge, I need not conduct a formal choice-of-law analysis. When there is no actual conflict between the states' relevant law—that is, when "the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit," *Nat'l Council on Compensation Ins., Inc. v. Caro & Graifman, P.C.*, 2008 WL 450413, at *19 (D. Conn. Feb. 15, 2008) (cleaned up)—there is no need to undertake a choice of law analysis. *See Metro. Life Ins. Co. v. Aetna Cas. and Sur. Co.*, 255 Conn. 295, 302 n.7 (2001) (explaining, in affirming trial court's judgment, that the "trial court did not undertake a choice of law analysis" because "there was no conflict between New York and Connecticut law"). In such a case, a court should "decide[ the case] under the law that is common to both states." *Gen. Star Indem. Co. v. Travelers Indem. Co.*, 2013 WL 1849285, at *8 (Conn. Super. Ct. Apr. 9, 2013) (cleaned up). In that analysis, the court considers both states' laws. *See, e.g., id.* at *8–11; *Metro. Life Ins. Co.*, 255 Conn. at 302 (commenting that trial court had "[a]ppl[ied] New York and Connecticut law"). Here, the application of either Ohio or Connecticut law would produce

the same outcome in this suit because those states' laws regarding breach of an insurance contract are the same in all relevant respects.

With respect to Connecticut law, "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy." *Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 583 (1990) (quoting *Schultz v. Hartford Fire Ins. Co.,* 213 Conn. 696, 702 (1990)); *see also Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 538 (2002). "The determinative question is the intent of the parties, that is, what coverage the plaintiff expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy." *Hammer*, 214 Conn. at 583 (cleaned up). "If the words in the policy are plain and unambiguous . . . the language . . . must be accorded its natural and ordinary meaning." *Id.* (cleaned up). If the policy is ambiguous, "such ambiguity is resolved against the insurance company." *Id.* at 584 (cleaned up). "As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." *Connecticut Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 6 (2008) (cleaned up). "The burden of proving that an exclusion applies is on the insurer, but the insured has the burden of proving that an exception to an exclusion reinstates coverage." *Capstone Bldg. Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 787–88 n.24 (2013) (citing *Buell Indus.*, 259 Conn. at 551).

Similarly, courts interpreting Ohio law "examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy." *Chicago Title Ins. Co. v. Huntington Nat'l Bank,* 87 Ohio St. 3d 270, 273 (1999). Ohio courts "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216,

219 (2003).  "[P]rovisions in an insurance contract that are reasonably susceptible of more than

one interpretation will be construed liberally in favor of the insured."  *Laboy v. Grange Indem.*

*Ins. Co.*, 144 Ohio St. 3d 234, 237 (2015).  But "[t]he general rule of liberal construction cannot

be employed to create an ambiguity where there is none."  *Erie Ins. Exchange v. Bullock*, 2015-

Ohio-5406, 55 N.E.3d 460, 465 (Ohio Ct. App. 2015).  And "[j]ust because the policy does not

define a term does not mean that the policy is ambiguous."  *Chicago Title Ins. Co*, 87 Ohio St. 3d

at 273.

      B.    <u>The Virus Exclusion</u>

The loss or damage caused by COVID-19 in this case falls within the scope of the Virus

Exclusion.  As a result, the Virus Exclusion bars coverage, so Twin City has not breached the

Policy by denying Cosmetic Laser's claim.

      1.    The Parties' Arguments

Although the plain language of the Virus Exclusion appears to apply and bar coverage,

Cosmetic Laser argues otherwise.  The Virus Exclusion bars coverage "for loss or damage

caused" by "'fungi', wet rot, dry rot, bacteria or virus."  Policy, Doc. No. 31-3, at 130.  But,

Cosmetic Laser argues, the word "virus" in the Virus Exclusion should be read in light of the

preceding pathogens.  Specifically, Cosmetic Laser applies the *ejusdem generis* canon of

construction (addressed further below) to reach its conclusion:  The scope of "virus" is narrowed

by the other listed terms—fungi, wet rot, dry rot, and bacteria—such that only viruses that attack

wood fall under the exclusion.  *See* Cosmetic Laser's Opp'n, Doc. No. 37, at 16–18.  Cosmetic

Laser cites one case that has interpreted a similar Virus Exclusion in that way and held that a loss

caused by COVID-19 fell outside the scope of the provision:  *Urogynecology Specialist of*

*Florida LLC v. Sentinel Ins. Co., Ltd*, 489 F. Supp. 3d 1297, 1302 (M.D. Fla. 2020) ("Denying

coverage for losses stemming from COVID-19 . . . does not logically align with the grouping of the virus exclusion with other pollutants such that the Policy necessarily anticipated and intended to deny coverage for these kinds of business losses.").  In sum, Cosmetic Laser urges that the meaning of "virus" is ambiguous and should be construed in Cosmetic Laser's favor.

Furthermore, Cosmetic Laser draws attention to the fact that Twin City could have—but did not—adopt the 2006 ISO[7] Endorsement in the Policy.  The 2006 ISO Endorsement explicitly bars coverage for losses resulting from communicable disease:

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease.
>
> However, this exclusion does not apply to loss or damage caused by or resulting from 'fungus', wet or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

Cosmetic Laser's Opp'n, Doc. No. 37, at 18.

Cosmetic Laser suggests that the 2006 ISO Endorsement, had it been included in the Policy, would apply to bar coverage.  By extension, Cosmetic Laser argues, its absence indicates that the Virus Exclusion does *not* apply to bar coverage.  Indeed, the 2006 ISO Endorsement would serve no purpose, in Cosmetic Laser's view, if the "Fungi, Bacteria or Virus Exclusions" pertained to communicable diseases, such as COVID-19.

Finally, Cosmetic Laser claims that even if the Virus Exclusion does apply to COVID-19, Cosmetic Laser can still secure "Time Element Coverage" under Subsection B.1.f.  Although Subsection B.1.b extends coverage only to instances in which the relevant virus is caused by a "specified cause of loss" or equipment breakdown, Cosmetic Laser argues that Subsection B.1.f

---

[7]    The Insurance Services Office "develops and publishes policy language that many insurance companies use as a basis for their products." *ISO General Questions*, Verisk, https://www.verisk.com/insurance/about/faq/ (last visited Aug. 11, 2021).

is not so limited.  After all, in Cosmetic Laser's view, the text of Subsection B.1.a explicitly

constrains only Subsection B.1.b.  Nothing so constrains Subsection B.1.f.  *See Indep.*

*Barbershop, LLC v. Twin City Fire Ins. Co.*, 499 F. Supp. 3d 331, 336 (W.D. Tex. 2020) ("The

text of the insurance policy does not limit Section B.1.f. to certain contributing causes.").

Cosmetic Laser reads the initial language of Subsection B.1.f.(1) ("If the loss which resulted in .

. . virus") as simply "inoperative" because there was no such loss here—indeed, it was COVID-

19 that caused the "loss."  Cosmetic Laser's Opp'n, Doc. No. 37, at 25.

 Twin City responds by emphasizing the plain meaning of the Virus Exclusion:  Nowhere

is "wood" mentioned in the exclusion, and the plain meaning of "virus" includes COVID-19.

Twin City notes that the vast majority of courts that have analyzed the relationship between

COVID-19 and the Virus Exclusion have denied coverage.  *See* Twin City's Reply, Doc. No. 44,

at 6 ("At least 26 courts—including one in Ohio just this week—have found that the exact Virus

Exclusion in Plaintiff's Policy bars losses related to COVID-19."); Notice, Doc. No. 53, at 1–2

(listing nine courts that held, between June 15 and July 19, 2021, that "the same Virus Exclusion

at issue here bars coverage for business interruption claims stemming from" COVID-19).  And,

in Twin City's view, my interpretation of the word "virus" should not depend on the words that

precede it in the Virus Exclusion.  More specifically, according to Twin City, the *ejusdem*

*generis* canon of construction is not applicable here because that canon applies only when

interpreting a general term that follows a list of more specific terms.  But "virus" is no more

general than "fungi," "wet rot," "dry rot," or "bacteria."  *See* Twin City's Reply, Doc. No. 44, at

6–7.

 Last, Twin City argues that Subsection B.1.f does not provide coverage for Cosmetic

Laser's loss.  Subsection B.1.f resides structurally within a provision that provides coverage only

under the particular circumstances provided in Subsection B.1.a.  *See Sys. Optics, Inc. v. Twin City Fire Ins. Co.,* 2021 WL 2075501, at *7 (N.D. Ohio May 24, 2021) (explaining that "[e]ach subsection of Section B of the endorsement works in concert to define the contours of the limited coverage provided in this section," and so Subsection B.1.f "does not provide standalone coverage for losses associated with viruses").  And even if Subsection B.1.f were interpreted in isolation from those other subsections, Twin City reads its antecedent as a prerequisite for coverage.  In Twin City's view, then, because there was no "loss which *resulted in* . . . virus," there can be no coverage under Subsection B.1.f.  *See* Policy, Doc. No. 31-3, at 131 (emphasis supplied).

2.      The Virus Exclusion Applies and Bars Coverage

Boiled down, the Policy (through the Virus Exclusion) provides that Twin City "will not pay for loss or damage caused directly or indirectly by . . . virus."  Policy, Doc. No. 31-3, at 130. By its plain and unambiguous terms, then, the Policy excludes coverage for Cosmetic Laser's claimed loss.  I join the vast majority of courts to consider this issue and conclude that COVID-19 is a "virus" within the meaning of the Policy.  *See, e.g.*, *Sys. Optics, Inc.*, 2021 WL 2075501, at *8 ("[T]he Virus Exclusion bars recovery under the policy, and for this reason alone, Twin City is entitled to judgment on the pleadings."); *J & H Lanmark, Inc. v. Twin City Fire Ins*. Co., 2021 WL 922057, at *5 (E.D. Ky. Mar. 10, 2021) ("Although the Court is extremely sympathetic with the plaintiff's position, it cannot ignore the plain, unambiguous language of the policy which excludes coverage."); *Pure Fitness LLC v. Twin City Fire Ins. Co.*, 2021 WL 512242, at *4 (N.D. Ala. Feb. 11, 2021) (holding that "the virus exclusion at issue is unambiguous and precludes coverage for Plaintiff's claimed losses").

Cosmetic Laser's counterarguments are weak.  Cosmetic Laser's main argument is that I should read "virus" to mean a "wood virus" in light of the terms that immediately precede it: fungi, wet rot, dry rot, and bacteria.  Cosmetic Laser relies heavily on the *ejusdem generis* canon of construction in support of its argument.  But that canon cannot bear the weight that Cosmetic Laser would have it carry.  First, as a general matter, canons of construction "are useful tools, but it is important to keep their limitations in mind." *Facebook, Inc. v Duguid*, 141 S. Ct. 1163, 1173 (2021) (Alito, *J.*, concurring).  A canon of construction should not be employed to trump a term's plain and unambiguous meaning.  Second, *ejusdem generis* is not the applicable canon here.  *Ejusdem generis* is a "canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Ejusdem generis*, Black's Law Dictionary (11th ed. 2019).  But that is not what we have here:  "fungi" and "bacteria" are no more specific than "virus."

Instead, if any canon of construction is applicable, it is *noscitur a sociis*, which is a "canon of construction holding that the meaning of an unclear word or phrase, esp. one in a list, should be determined by the words immediately surrounding it." *Noscitur a sociis*, Black's Law Dictionary (11th ed. 2019); *see also* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 205 (2012) ("In all contexts other than the pattern of specific-to-general, the proper rule to invoke is the broad associated-words canon, not the narrow *ejusdem generis* canon.").[8]

---

[8]    *Noscitur a sociis* is accepted in Ohio and Connecticut as a canon of contract interpretation.  *See Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St. 3d 397, 406 (2011) ("Under the doctrine of noscitur a sociis, the meaning of an unclear word may be derived from the meaning of accompanying words."); *Karas v. Liberty Ins. Co.*, 335 Conn. 62, 103–04 (2019) (using *noscitur a sociis* to interpret an insurance contract).

Again, there is no reason to apply any canon of construction,[9] but, even applying the

*noscitur a sociis* canon, Cosmetic Laser would lose.  Considering the other pathogens listed in

the Virus Exclusion reinforces the conclusion that the meaning of "virus" is not restricted to

wood-related viruses.  Consider "fungi," which is defined in the Policy as "any type or form of

fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced

or released by fungi."  Policy, Doc. No. 31-3, at 132.  Mold or mildew growing inside a

porcelain bathtub or toilet is thus "fungi" within the meaning of the Policy.  Because the Policy

defines "fungi" expansively, "virus" should be interpreted similarly expansively.  It would be

incongruous to give "virus" an unusually restrictive meaning.

*Urogynecology*, which reached the opposite conclusion, has been repeatedly rejected by

courts interpreting the same virus exclusion.  *See, e.g., Sys. Optics, Inc.*, 2021 WL 2075501, at

\*5 ("Courts have consistently rejected the reasoning in *Urogynecology*."); *J & H Lanmark, Inc.*,

2021 WL 922057, at \*3 ("[T]o the extent [] *Urogynecology* . . . declined to assign 'virus' its

plain meaning, the Court disagrees with that interpretation."); *Robert E. Levy v. Hartford Fin.*

*Servs.*, 2021 WL 598818, at \*6 (E.D. Mo. Feb. 16, 2021) (noting that "[t]he *Urogynecology*

court declined to reach 'a decision on the merits of the plain language of the policy' because

certain 'forms' referenced in the exclusion for loss caused by a 'virus' were not included in the

policy or provided to the court" and remarking that, by contrast, "courts that have examined the

entire policy have found the policy language unambiguous and reject *Urogynecology*'s

conclusion") (quoting *Urogynecology*, 489 F. Supp. 3d at 1302–03); *Founder Inst. v. Hartford*

---

[9]     *Noscitur a sociis* is used to "resolve ambiguity, not create it."  *Yates v. United States*, 574 U.S. 528, 564 (2015) (Kagan, *J.*, dissenting); *see also Ashland Chem. Co. v. Jones*, 92 Ohio St. 3d 234, 237 (2001) (noting that *noscitur a sociis* is applied only where "the meaning of a word is unclear"); *Karas, v. Liberty Ins. Co.*, 335 Conn. 62, 104 (noting that the canon of *noscitur a sociis* is only an aid when language is ambiguous).  As I have already described, the wording of the Virus Exclusion is clear and unambiguous.

*Fire Ins. Co.*, 497 F. Supp. 3d 678, 679 (N.D. Cal. 2020) ("[T]he district court in

[*Urogynecology*] did not cite anything—from the complaint or elsewhere—that would support a

conclusion that a business shutdown due to a pandemic falls outside the scope of the virus

exclusion."). I join those courts: I do not find the analysis in *Urogynecology* persuasive.

Cosmetic Laser's argument based on the Policy's omitting the 2006 ISO Endorsement is

also weak. Because the Virus Exclusion and the 2006 ISO Endorsement *both* bar COVID-

related coverage for loss of use, it was unnecessary to include the 2006 ISO Endorsement in the

Policy. *See, e.g.*, *Robert E. Levy*, 2021 WL 598818, at *6 ("This argument simply amounts to

stating that Defendants could have drafted a clearer exclusion; but that does not mean that the

exclusion at issue is ambiguous."). "[I]f the language of the contract is clear and unambiguous,

[] courts must look only to the four corners of the contract to discern the parties' intent."

*Konover v. Kolakowski*, 186 Conn. App. 706, 720 (2018); *see also Campbell v. 1 Spring, LLC*,

2020-Ohio-3190, 155 N.E.3d 186, 191 (Ohio Ct. App. 2020) ("If the terms of the contract are

clear and precise, it is not ambiguous and the court may not refer to evidence outside the contract

to determine the meaning of those terms."). Cosmetic Laser cannot introduce ambiguity into the

Policy by pointing to different language from different contracts.

The "Time Element Coverage" granted by the Policy in Subsection B.1.f does not

somehow create an exception to the Virus Exclusion in this instance. Cosmetic Laser's view—

that its loss of use might be covered under Subsection B.1.f—takes Subsection B.1.f entirely out

of context and violates basic principles of contract interpretation. *See Afkari-Ahmadi v. Fotovat-*

*Ahmadi*, 294 Conn. 384, 391 (2009) ("[W]hen interpreting a contract, we must look at the

contract as a whole, consider all relevant portions together and, if possible, give operative effect

to every provision in order to reach a reasonable overall result.") (cleaned up). Viewing Section

B.1 as a whole suggests that "Time Element Coverage" under Subsection B.1.f is limited by Subsection B.1.a, which requires that the covered "virus" be caused by either a "specified cause of loss" or equipment breakdown.  Subsection B.1.a establishes that prerequisite for "[t]he coverage described in" Subsection B.1.b.  Subsections B.1.c,[10] B.1.d,[11] and B.1.e[12] all explicitly concern the coverage provided within Section B.1.  So it is difficult to understand why Subsection B.1.f would be included within Section B.1 if it were unrelated to the theme of the section:  The Policy covers damage resulting from a virus only when the virus is caused by a "specified cause of loss" or equipment breakdown.

Subsection B.1.f.(1) makes perfect sense if it clarifies how Time Element Coverage interacts with the restrictions found in Subsection B.1.a.  "If *the* loss" (the loss mentioned previously in Subsection B.1.a) "*which resulted in* . . . virus" (as Subsection B.1.a requires) "does not in itself necessitate a suspension of 'operations', but such suspension is necessary *due to loss or damage to property caused by . . . virus*" (the subject of Subsection B.1.b), "then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days . . . ."  Policy, Doc. No. 31-3, at 131–32 (emphases added).  For example, suppose a sinkhole collapse (a specified cause of loss) resulted in damage to the structure of a business.  Fungi and rot spread as a result.  Section B.1 provides coverage for direct physical loss or physical damage flowing from the fungi and rot because Subsection B.1.a is satisfied.  And if the sinkhole collapse did not itself cause the business to

---

[10]     "[T]he coverage described under this Limited Coverage is no more than . . . ."  Policy, Doc. No. 31-3, at 131.

[11]     "The coverage provided under this Limited Coverage does not increase . . . ."  Policy, Doc. No. 31-3, at 131.

[12]     "The terms of this Limited Coverage do not increase or reduce . . . ."  Policy, Doc. No. 31-3, at 131.

suspend its operations, but the fungi and rot did, Subsection B.1.f provides up to 30 days of coverage.

By contrast, Subsection B.1.f does not make much sense if interpreted as a standalone provision. What would "*the* loss which resulted in . . . virus" refer to? Why would a subsection concerned with Time Element Coverage presume that there was such a loss? Cosmetic Laser responds that no such loss is required and seeks to ignore that portion of the Policy, but that is a weak argument for several reasons.

First, Cosmetic Laser simply carves out an essential chunk of Subsection B.1.f. That subsection requires a specified cause of loss—which does not itself result in business suspension—to result in a virus that does cause such suspension. That is a precondition for the 30-day Time Element Coverage to trigger. Although COVID-19 undoubtedly resulted in Cosmetic Laser's suspending its business, Cosmetic Laser itself *admits* that no loss resulted in the virus. *See* Cosmetic Laser's Opp'n, Doc. No. 37, at 25 ("[T]here was no loss that caused the virus."). Thus, in this instance Subsection B.1.f *as a whole* is inoperative. *See Q Clothier New Orleans LLC*, 2021 WL 1600247, at *10 ("Even assuming *arguendo* that the Time Element clause provided standalone coverage . . . the Time Element provision requires for the loss to result in a virus, which [Plaintiff] does not allege . . . .").

Second, Cosmetic Laser's interpretation of Subsection B.1.f would conflict with the function of the Virus Exclusion. Under Cosmetic Laser's reading, Time Element Coverage would be available whenever a virus resulted in business suspension. If that were correct, not only would Subsection B.1.f.(1) be needlessly convoluted (on Cosmetic Laser's reading, it could just say "business interruptions resulting from fungi, wet or dry rot, bacteria or virus are covered for up to 30 days"), but also (and more importantly) Subsection B.1.f would swallow the Virus

Exclusion as a whole.  The Virus Exclusion begins by firmly stating that loss or damage resulting from a virus "is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  Policy, Doc. No. 31-3, at 130.  On Cosmetic Laser's reading, that same Virus Exclusion, just one page later, would grant coverage—without limitation—for suspension of business operations due to a virus.  I will not "read[] the Limited Coverage provision in the Virus Exclusion to subsume the Policy and the exclusion, itself."  *Sys. Optics, Inc.*, 2021 WL 2075501, at *7.

Finally, Cosmetic Laser relies on *Independence Barbershop* to support its dubious reading, but that court's approach has been rejected in other cases for the reasons I have already described.  *See, e.g., J & H Lanmark, Inc.* 2021 WL 922057, at *10 (discounting *Independence Barbershop* because it "fails to apply well-established rules of contract interpretation"); *Q Clothier New Orleans LLC*, 2021 WL 1600247, at *10 ("The *Independence Barbershop* court's interpretation of section B.1.f. does not address basic contract principles."); *Robert E. Levy*, 2021 WL 598818, at *8 ("Having concluded that Plaintiffs failed to allege the prerequisites, the Court declines to follow *Independence Barbershop*.").  For all those reasons, the Virus Exclusion applies and bars coverage.

### C.   Time Element Coverage

Even if I did not interpret the Virus Exclusion to bar coverage, I would still grant Twin City's motion to dismiss.  That is because Time Element Coverage is unavailable:  Cosmetic Laser has not plausibly alleged direct "physical loss" or "physical damage" to its property.

### 1.   The Parties' Arguments

Cosmetic Laser argues that the Policy's Business Income and Extra Expense coverages are available here.  As described above, both forms of coverage require "direct physical loss" of

or "physical damage" to property.[13]  Cosmetic Laser interprets "direct physical loss" not to require tangible, structural change to property.  Mere loss of use, according to Cosmetic Laser, can amount to direct physical loss.  *See* Cosmetic Laser's Opp'n, Doc. No. 37, at 26.  According to Cosmetic Laser, interpreting the phrase "direct physical loss" to require structural alteration would render the term "physical damage" superfluous.  Instead, according to Cosmetic Laser, the Policy's including both terms—"direct physical loss *or* physical damage"—implies that the two terms have distinct meanings.  Certain courts apparently agree with that reading.  *See MacMiles LLC d/b/a Grant Street Tavern v. Erie Ins. Exchange* (Allegheny Cty. C.C.P. May 25, 2021), Ex. 1 to Notice, Doc. No. 45-1, at 14.

"Direct physical loss," Cosmetic Laser continues, includes loss of functionality to physical space.  Again, Cosmetic Laser's position is not entirely without support.  *See, e.g.*, *id.* at 16 (reasoning that there may have been "direct physical loss" because "the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time, if at all"); *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 2021 WL 679109, at *9 (N.D. Ill. Feb. 22, 2021) (holding that a reasonable juror could find that plaintiff suffered "direct physical loss" because "the pandemic-caused shutdown orders [] impose a *physical* limit: the restaurants are limited from using much of their physical space").

To bolster its argument, Cosmetic Laser analogizes this case to other non-COVID cases in which courts have held that a "direct physical loss" might have occurred even though there

---

[13]     Similarly, Civil Authority coverage requires "physical loss" to nearby property.  *See* Policy, Doc. No. 31-3, at 44 (explaining that Civil Authority coverage requires "a Covered Cause of Loss to property in the immediate area").

was no tangible, structural alteration to property.  *See Murray v. State Farm Fire and Cas. Co.*,

203 W. Va. 477, 493 (W. Va. 1998) ("Losses covered by the policy, including those rendering

the insured property unusable or uninhabitable, may exist in the absence of structural damage to

the insured property."); *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 827 (3d Cir.

2005) (holding that "direct physical loss" can be satisfied when a property is rendered "useless or

uninhabitable"); *TRAVCO Ins. Co. v. Ward,* 715 F. Supp. 2d 699, 709 (E.D. Va. 2010) (rejecting

the argument that physical alteration to property is required for "direct physical loss" when

property is rendered "unusable" or "uninhabitable").

The parties disagree regarding whether the Policy's Period of Restoration definition[14]—

which determines the period of time during which Time Element Coverage might apply—

implies that coverage extends only to situations in which property has been structurally altered.

Cosmetic Laser points out that the Period of Restoration may end when the insured resumes its

business at a new location, a situation which does not necessarily involve repair, rebuilding, or

replacement.  *See* Policy, Doc. No. 31-3, at 57.  Thus, according to Cosmetic Laser, the Period of

Restoration definition "contemplates a meaning of 'direct physical loss or damage' that

encompasses the loss of function of covered property in the absence of structural alteration."

Cosmetic Laser's Opp'n, Doc. No. 37, at 33.

Cosmetic Laser argues that the meaning of "direct physical loss" is at least ambiguous.

*See Henderson Road Rest. Sys., Inc. v. Zurich American Ins. Co*., 2021 WL 168422, at *12 (N.D.

Ohio Jan. 19, 2021) (determining that the meaning of "direct physical loss" was ambiguous and

liberally construing it in Plaintiff's favor).  Finally, even if structural alteration were

---

[14]      The end of the Period of Restoration is defined (in relevant part) as when either "(1) The property . . .
should be repaired, rebuilt or replaced with reasonable speed and similar quality" or "(2) The date when your
business is resumed at a new, permanent location."  Policy, Doc. No. 31-3, at 57.

unambiguously required for "direct physical loss," Cosmetic Laser argues in the alternative that it has alleged that COVID-19 structurally altered the surfaces and ambient air of its Medi Spas. *See* Cosmetic Laser's Opp'n, Doc. No. 37, at 33–34; *Schleicher & Stebbins Hotels, LLC, et al. v. Starr Surplus Lines Ins. Cos., et al.* (N.H. Super. Ct. June 15, 2021), Ex. 2 to Notice, Doc. No. 45-2, at 23 (concluding that property contaminated with coronavirus experienced distinct and demonstrable alteration).

Twin City takes a different view.  Twin City argues that even if "physical loss" and "physical damage" have distinct meanings, both require tangible alteration of property.  *See* Twin City's Reply, Doc. No. 44, at 12.  Twin City claims that Cosmetic Laser's interpretation would read "direct" and "physical" out of the Policy.  *See id.*  Although Twin City concedes that some other courts have held that "substances other than viruses . . . [can] cause direct physical loss or damage," Twin City explains that those cases are inapplicable to COVID-19 claims in large part because COVID-19 harms *people*, and, when it comes to surfaces, "[t]here is no dispute that COVID-19 can be cleaned with household cleaners," so COVID-19 contamination does not amount to a "direct physical loss." *Id.* at 12–13.

The Period of Restoration provision, according to Twin City, confirms that tangible alteration to property is required for coverage.  *See* Twin City's Mem. of Law, Doc. No. 36-1, at 24.  After all, that provision presumes that effected property will require repairs, rebuilding, or replacing, or that a business will need to be permanently relocated.  But Cosmetic Laser's preventative measures in response to the pandemic did not amount to repairs.

To the extent that Cosmetic Laser alleges that the virus was present within and caused damage to its property, Twin City has three responses.  *See id.* at 28–30.  First, the relevant government orders required all nonessential businesses to close, so Cosmetic Laser's business

would have been impacted regardless of the presence of coronavirus.  The cause of Cosmetic

Laser's income losses, then, was not the virus but rather the government orders.  Second, Twin

City argues that I should not entertain Cosmetic Laser's "pure speculation" regarding the

presence of the virus on its property.  The complaint does not mention any "testing" or

"confirmation that someone spent any meaningful time at the properties while infected."  *Id.* at

29.  Third, physical loss or damage encompasses only tangible changes in property that require

repair.  But coronavirus can simply be cleaned.  Thus, the virus does not cause tangible, physical

harm to property.

2.      Time Element Coverage Does Not Apply

Under both Ohio and Connecticut law, "direct physical loss" requires physical alteration

of property.  The presence of COVID-19 at Cosmetic Laser's properties did not physically alter

those properties.  For that simple reason, neither the Policy's Business Income provision nor the

Extra Expense provision applies to cover Cosmetic Laser's claim for loss of use.[15]

Ohio courts construing similar phrases in insurance contracts have interpreted "physical"

to require some kind of alteration to property.  For instance, in interpreting the phrase "physical

injury" in a homeowners' insurance contract, the Ohio Court of Appeals noted that "[t]he

requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held

to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim

against the property insurer when the insured merely suffers a detrimental economic impact

unaccompanied by a distinct, demonstrable, physical alteration of the property."  *Mastellone v.*

*Lightning Rod Mut. Ins. Co.,* 175 Ohio App. 3d 23, 41 (2008) (quoting 10A Couch on

---

[15]    For the same reason, Civil Authority coverage also does not apply.  Cosmetic Laser has failed to allege that COVID-19 caused "physical loss" to nearby property for the same reason it has failed to allege "physical loss" to its own property.  *See supra* n.13.

INSURANCE § 148:46 (3d ed. 1998)).  Connecticut courts interpreting similar phrases in insurance contracts have reached the same conclusion.  For example, a Connecticut federal district court recently concluded that the phrase "direct physical loss" in an insurance contract meant "physical, tangible alteration to any property."  *England v. Amica Mut. Ins. Co.*, 2017 WL 3996394, at *8 (D. Conn. Sept. 11, 2017) (holding that imperceptible chemical reactions occurring within concrete walls do not amount to "direct physical loss") (citing *Capstone Bldg. Corp.*, 308 Conn. at 782) (cleaned up).  Such loss "must be in the form of a perceptible harm," and "is limited to observable, tangible effects."  *Id.* at *7.

In a conclusory fashion, Cosmetic Laser alleges that COVID-19 has structurally altered the surfaces and ambient air of its property.  *See* Am. Compl., Doc. No. 34, at ¶ 29.  But the suggestion that COVID-19 alters or harms not only people, but property, clashes with ordinary meaning.  "Structural alteration" means a "significant change to a building or other structure, essentially creating a different building or structure."  *Alteration*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "structural alteration").  The presence of fleeting, microscopic entities does not amount to significant structural change.  "If, for example, a sick person walked into one of Plaintiffs' restaurants and left behind COVID-19 particulates on a countertop, it would strain credulity to say that the countertop was damaged or physically altered as a result."  *Unmasked Mgmt., Inc. v. Century-National Ins. Co.*, 2021 WL 242979, at *6 (S.D. Cal. Jan. 22, 2021).  To the extent that Cosmetic Laser's theory relies on the truism that mucus or saliva, ejected from a sneeze, attaches and adheres to surfaces, what difference does it make whether harmful viruses are present within?  Cosmetic Laser's theory renders every sneeze, cough or even exhale a "structural change."  That cannot be right.

Furthermore, Cosmetic Laser acknowledges that it cleaned surfaces in response to the potential spread of COVID-19.  *See* Am. Compl., Doc. No. 34, at ¶ 80.  Property has not experienced "physical loss" or "physical damage" when all that is required from the property owner is a simple cleaning.  *See Uncork and Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 883–84 (S.D.W. Va. 2020).  And, ultimately, not even a cleaning is required:  As even Cosmetic Laser admits, COVID-19 does not linger on surfaces forever.  *See* Am. Compl., Doc. No. 34, at ¶ 43.  It would be odd indeed if one could simply wait several days for a "physical structural alteration" to resolve itself.

Cosmetic Laser's counterargument—that tangible alteration to property is not required for coverage—again is weak.  The fact that "direct physical loss" and "direct physical damage" both require tangible alteration to property does not render either term superfluous.  Property can be stolen (a physical loss) without being damaged.  Likewise, when property is incinerated by a fire (a physical loss) it has not merely been damaged—it is entirely gone.  *See Chief of Staff LLC v. Hiscox Ins. Co. Inc.*, 2021 WL 1208969, at *3 (N.D. Ill. Mar. 31, 2021) (noting that a thief who steals a computer renders it "physically lost" but not "physically damaged," and a thief who smashes it with a hammer renders it "physically damaged" but not "physically lost," but a thief who renders it temporarily unusable via hacking causes neither "physical loss" nor "physical damage") (interpreting Connecticut law).  Thus, both "physical loss" and "physical damage," despite requiring tangible alteration to property, retain unique meanings; neither phrase is rendered superfluous.  Because both "physical loss" and "physical damage" require tangible alteration to property, Cosmetic Laser's claim for mere loss of use is neither "physical loss" nor "physical damage."

The Policy's Period of Restoration definition further suggests that mere loss of use is not "physical loss" or "physical damage" to property.  The Policy explains that a Period of Restoration ends, and Business Income and Extra Expense coverage thus terminates, when "[t]he property . . . should be repaired, rebuilt or replaced with reasonable speed and similar quality." Policy, Doc. No. 31-3, at 57.  "That the policy provides coverage until property 'should be repaired, rebuilt or replaced' or until business resumes elsewhere assumes physical alteration of property, not mere loss of use."  *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021); *see also Ceres Enters., LLC v. Travelers Ins. Co.*, 2021 WL 634982, at *5 (N.D. Ohio Feb. 18, 2021) ("Reading 'direct physical loss of or damage to' property to include loss of intended use, as Plaintiff urges, would render the Period of Restoration nonsensical or meaningless because no repair, rebuilding, or replacement of the covered property will occur."); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 508 F. Supp. 3d 186, 199 (N.D. Ohio 2020) ("[C]onstruing 'direct physical loss' or 'direct physical damage' to cover intangible losses, such as the economic losses Santo's seeks to cover, would render large parts of the '*period of restoration*' definition nonsensical because intangible losses cannot be repaired, rebuilt, or replaced.").  Adopting Cosmetic Laser's interpretation would render the Period of Restoration definition nonsensical.

Cosmetic Laser's supporting precedent lacks persuasive force.  Its strongest case—*Henderson Road*—has been widely rejected by other Ohio courts.  *See, e.g., MIKMAR, Inc. v. Westfield Ins. Co.*, 2021 WL 615304, at *10–11 (N.D. Ohio Feb. 17, 2021); *Family Tacos, LLC v. Auto Owners Ins. Co.*, 2021 WL 615307, at *11 (N.D. Ohio Feb. 17, 2021); *Ceres Enters.*, 2021 WL 634982, at *11; *Equity Planning Corp. v. Westfield Ins. Co.*, 2021 WL 766802, at *13–14 (N.D. Ohio Feb. 26, 2021); *Dharamsi v. Nationwide Mut. Ins. Co.*, 2021 WL 1979085, at *4–

5 (S.D. Ohio May 18, 2021).  In any event, *Henderson Road* is distinguishable because the policy at issue in *Henderson Road* contained a different "Period of Restoration" provision than the one at issue here.  *See Henderson Road*, 2021 WL 168422, at *13 (explaining that the "period of restoration" in that policy "ended or will end on the dates the states' restrictions are lifted because that will constitute the 'date when the location where the loss or damage occurred could have been physically capable of resuming the level of "operations" which existed prior to the loss or damage'") (quoting "Period of Restoration" provision).  By contrast, here, the Policy's Period of Restoration definition does not include such a term.[16]

Many of the other cases Cosmetic Laser cites that suggest that "direct physical loss" does not require tangible alteration to property do not apply Ohio or Connecticut law.[17]  And, in any event, the cases are distinguishable because of the harms suffered in those cases.  In *Murray*, for instance, "several large boulders and rocks" fell on plaintiffs' homes; as a result, firemen compelled the homeowners to abandon their homes due to the risk posed by the loose cliff.  203 W. Va. at 481.  The danger was substantial enough that the city refused to issue building permits to rebuild or repair the homes, requesting instead to have them torn down.  *See id.* at 481 n.2.  Similarly, "[w]ithin a week and a half of moving in" to their home, the plaintiff-homeowners in *Hardinger* suffered respiratory, viral and skin conditions from an e-coli contaminated well.  *See* 131 F. App'x at 824.  On summary judgment, the court determined there was "a genuine issue of

---

[16]     The same issue is present in *Macmiles LLC d/b/a Grant Street Tavern*, which Cosmetic Laser submitted in a notice of supplemental authority.  *See* Ex. 1 to Notice, Doc. No. 45-1.  There, the insurance policy stated that Business Income coverage would end either when "Plaintiff's business is once again operating at normal capacity after damaged or destroyed property is fixed or replaced, *or* within twelve (12) months from the initial date of loss in circumstances where it is not necessary to fix or replace damaged or destroyed property."  *Id.* at 18.

[17]     The *Schleicher* court, for example, determined that "distinct and demonstrable" alterations to property need not be perceptible by any of the five senses.  *Schleicher & Stebbins Hotels, LLC, et al.,* Ex. 2 to Notice, Doc. No. 45-2, at 22.  But that court relied entirely on caselaw from the New Hampshire Supreme Court to arrive at that conclusion.  *Id.*

fact whether the functionality of the [homeowners'] property was nearly eliminated or destroyed, or whether their property was made useless or uninhabitable." *Id.* at 826–27.  In *TRAVCO Ins. Co.*, noxious sulfur fumes rendered the homeowners' residence "unusable."  715 F. Supp. 2d at 709.  And besides, the insurance policy in that case defined "'Property Damage' to include 'loss of use of tangible property.'"  *Id.*

In contrast to those cases, COVID-19 has not eliminated the utility of Cosmetic Laser's property.  Nor has the pandemic forced Cosmetic Laser to abandon its property.  Rather, the pandemic and government closure orders related to the pandemic temporarily reduced Cosmetic Laser's (and many other companies') business operations.  Furthermore, COVID-19 closure orders sought to diminish the spread of the virus by restricting the behavior of individuals.  The orders were not issued based on some deficiency in Cosmetic Laser's property; in the COVID era, being indoors is dangerous only insofar as other individuals share the space.  Thus, Cosmetic Laser's property contained no hazardous flaw, akin to the threat of falling rocks or seepage of poisonous fumes, which would be just as threatening to one person as to one hundred.

## IV.   Conclusion

For the foregoing reasons, I **grant** Twin City's motion to dismiss, doc. no. 36.  The Clerk is instructed to enter judgment for the defendant and to close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 11th day of August 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge